[Civ. No. 2664.   Fourth Dist.   Mar. 3, 1942.]

ANNA CLARK et al., Respondents v. ROBERT W. HUDDLESTON et al., Appellants.

W. M. Conley, Philip Conley, Matthew Conley, Conley, Conley & Conley, Randell Larson, Wright & Wright & Larson and Redman, Alexander & Bacon for Appellants.

Rae B. Carter and John D. Chinello for Respondents.

BARNARD, P. J.—This is an action for damages for injuries alleged to have been suffered by the plaintiff wife. A jury returned a verdict for $25,000 in her favor and $1628.65 in favor of her husband. The defendants have appealed from the judgment which followed.

There is little dispute with respect to the facts surrounding the incident out of which the action arose. The appellant corporation operated a department store in Fresno, of which the individual defendant was the assistant manager. Mrs. Clark had come to this store to shop, accompanied by her friend Mrs. Logoluso and the latter's four-year-old daughter. At the rear of this store there was a freight elevator which had doors opening into the storeroom and, on the opposite side, doors which opened upon the alley. When the floor of the elevator was at the level of the alley entrance it was some ten inches above the floor level in the store. The elevator doors on the store side were operated by hand and consisted of an upper and a lower section which were so counter-balanced that when the upper section moved upward the lower section moved downward, and vice versa. At the bottom of the upper section was an iron "lip" which fitted over the top of the lower section when the two sections were brought together in closing the doors.

About noon on May 2, 1940, a truckload of potted plants

was unloaded at the alley entrance and placed upon the floor of this freight elevator and the appellant Huddleston was in the elevator assisting in this operation. The floor of the elevator was at the alley level and the inner doors of the elevator were also open, the top of the lower section being on a level with the floor of the elevator and covering the space between the floor of the elevator and the floor of the store.

About that time Mrs. Clark observed these potted plants which she said appeared to be in an ''opening'' about a foot above the floor level, although she said she did not know this was an elevator. She asked a saleslady if these plants were for sale and was told that they were. The two stepped over to the front of the elevator and looked at the plants. Mrs. Clark selected a plant and pointed it out to the saleslady, who stepped into the elevator to get it. While she was doing this Mrs. Clark leaned forward and spoke about another plant. As she straightened up the top of the upper section of the door, which was then being lowered a few inches, came in contact with her head.

The reason for the lowering of the upper half of this door at this time appears as follows: While the selection and sale of the plant was in progress Mrs. Logoluso's small daughter had stepped upon the top of the lower section of the door, which had been at the level of the floor of the elevator, and this action caused the lower section of the door to go down until its top was at the floor level of the store. Mr. Huddleston, who was in the elevator, observing this and desiring to raise the lower section of the door to the floor level of the elevator in order that there be no opening left between the floor of the elevator and the floor of the store, took hold of the upper section of the door and pulled it down some ten or twelve inches, which also had the effect of raising the lower section a similar distance. There is a conflict in the evidence as to whether he gave a warning that he was about to move the doors of the elevator. Several witnesses testified that he did so and others testified that they heard no warning at all. He testified that he did not know that a sale was in progress and did not see the parties engaged therein, and that while he was lowering the upper section he could not see out of the elevator. As he lowered the upper section, he heard it come in contact with Mrs. Clark's head.

Mrs. Clark made no outcry, although she made some re-

mark about bumping her head. The saleslady, who had not seen the door come in contact with her head, asked her if it hurt and she replied: "No." Shortly thereafter Mrs. Clark and Mrs. Logoluso and her daughter left this store and visited three other stores. Then Mrs. Clark got her automobile and they came back to the Woolworth store and got the plant. Mrs. Clark then drove to her home where she made some coffee for herself and Mrs. Logoluso. They talked awhile, after which Mrs. Clark got some checks which she wanted to deposit and they drove to a bank. Mrs. Clark then took Mrs. Logoluso and her daughter home and then returned to her own home. Sometime that evening Mrs. Clark called Mrs. Logoluso on the phone and asked her what had happened, saying that she could remember nothing of what had occurred that day. The next day she consulted her physician. On May 23, 1940, Mrs. Clark went to the court house and passed an examination for citizenship. About that time she complained about blurred or double vision and at the suggestion of her physician consulted an eye specialist. On June 3, 1940, she went to San Francisco to consult a brain specialist and remained there for observation for fifteen days. Her condition improved somewhat thereafter and this action was tried in January, 1941.

The appellants first contend that there was no evidence disclosing negligence on their part and that it must be held, as a matter of law, that Mrs. Clark was guilty of contributory negligence. It is argued in this connection that appellant Huddleston was required, through no fault of his own, to move the doors of the elevator because the little girl had depressed the lower section leaving a portion of the elevator shaft exposed; that he gave a warning before he moved the doors; that Mrs. Clark should have and must have seen that the doors were in motion; that Mrs. Clark, while in a position of safety, suddenly leaned over to point to a plant and thus brought her head into the plane in which the door was moving; that Huddleston could not possibly know that she was going to change her position while he was moving the doors; that Mrs. Clark failed to observe a "danger" sign which was above the elevator doors and also failed to observe the moving of the doors, which were in plain sight; and that it follows that any injury received must be attributed solely to Mrs. Clark's negligence.

While there is some conflict, and without completely re-

viewing the evidence in this connection, it must be held that, at best, nothing more appears than a question of fact which was for the jury. While standing immediately in front of and facing the elevator and engaged in selecting a plant from among those upon the floor of the elevator, and with the saleslady inside the elevator for the purpose of getting the plant selected, it cannot be said, as a matter of law, that it was not a reasonable act for Mrs. Clark to lean over while commenting upon the different plants. The situation was, or should have been, obvious to Huddleston and he should not have lowered this door between the customer and the saleslady engaged in making the sale without taking reasonable precautions that it could be done in safety. Whether he took such reasonable precautions under the peculiar circumstances here existing was, to say the least, a question of fact and not one that can here be disposed of as a matter of law.

Some contention is further made that one of the instructions in effect told the jury that the appellants were insurers of the safety of the premises while Mrs. Clark was only called upon to use ordinary care. Not only is the instruction in question not susceptible of that interpretation but when considered with the other instructions given it appears that the jury was fully and correctly instructed in this regard. The contention here made is without merit.

The most serious question raised is as to whether the evidence supports an award of $25,000 for the injuries sustained by Mrs. Clark, and whether it appears that such a verdict must have been arrived at through the influence of passion or prejudice.

It is at once apparent that the amount of the verdict is excessive unless it covers future damage which Mrs. Clark would suffer after the date of the trial, which was some eight months after the alleged injury. While such future detriment may be considered and allowed for it must be such as is reasonably "certain to result in the future" (Civil Code, sec. 3283), and it must be such damage as arises from the injury complained of. While there was evidence in the form of testimony by expert witnesses that the condition of Mrs. Clark, of which she complains, was the result of hysteria unconnected with this accident, and while other portions of the evidence support this theory and strongly indicate that the injury itself was trivial in nature, it is also true that a part

of the evidence supports the inference that Mrs. Clark received very substantial injuries as a result of the accident, and one expert witness expressed the opinion that she received an injury which would be permanent. Because of this and other testimony given by another expert witness it is necessary to review rather fully the evidence in this regard, especially in view of the rather unusual situation which here appears.

Mrs. Clark was 34 years of age. She testified that her health was "absolutely perfect" before the accident; that she had no trouble with her eyes, did her own housework, drove automobiles, and assisted her husband in his business; that she had worked as a dressmaker before marriage and made her own clothes; that immediately after the accident she became "foggy" and that when she "came to" that evening she remembered nothing of what happened; that she vomited for five days and suffered severe pains in her neck and head and was tired and dizzy; that she remained continually in bed until June 2, 1940, except on May 23, 1940, when she went to the court house and passed an examination for citizenship; that her physician, Dr. Calloway, prescribed ice packs and recommended that she remain in bed; that about May 23, 1940, she began to see "double"; that she then consulted Dr. Goldstein, an eye specialist; that on his recommendation she went, on June 3, 1940, to San Francisco to consult Dr. Brown, a specialist in brain and nerve surgery, where she remained some fifteen days; that she felt much better when she returned to Fresno; that her eyes were then much better and things were not blurred or double any more; that when she got home she stayed in bed on and off for three months; that since that time she has operated her husband's Fresno business but cannot do it as well as before, and cannot remember so well; that now if she looks at anything any length of time it gets blurred or double; that she cannot work at sewing although she has not tried that sort of work much; that she can only read five or ten minutes without its getting blurred; that she has a pain in her head, her neck is stiff and she cannot move so quickly; and that she cannot remember as many telephone numbers as she used to.

Her family physician, Dr. Calloway, testified that she came to his office on May 3, 1940; that she complained of soreness in her neck and had a bump on her head about the size of a

half dollar, which was blue in color and with a swelling; that the color and swelling left in about ten days; that he saw her every day for several days and then saw her three or four times a week because she would call him and say her head was not any better; that later she complained of having double vision and he suggested that she see an eye man; and that when she first came to his office he did not think much of the injury she complained of and considered it a minor injury. He also testified that he had treated her for nearly a year before this accident; that she had a goiter; that it was an internal one which could not be seen without examination; and that he knew nothing about goiters.

Dr. Goldstein, the eye specialist, testified that he first saw Mrs. Clark on May 30, 1940; that he had just returned from the east and found that his associate had been called on the case about May 24; that his associate told him he had a ''very unusual situation out there''; that he agreed with his associate when he examined her on May 30; that Mrs. Clark told him of what had occurred on May 2, 1940, that she did not become conscious of her surroundings until that evening, and that she since had had quite a headache and her mind was not clear; that he examined her and found that her eyes turned in toward her nose and were what is called ''crossed''; that the rest of her cranial nerves were all right, her hearing was all right, the sensation of her face was all right, her swallowing was all right, her tongue was all right, and her sense of smell was all right; that he had never seen anything ''quite the equal of this'' and so he arranged for her to go to a Dr. Brown in San Francisco, which she did; that after she returned from San Francisco her eyes were theoretically straight although there was an imbalance or incoordination of the eyes in that when the eyes were moved one would lag and not move as fast as the other; and that this condition still existed at the time of the trial. He further testified that he had given her no special treatment but advised her to remain in bed; that there was a marked improvement after she returned from San Francisco; that her eyes were theoretically straight now; that some of her symptoms are more logically explained on the basis of hysteria and some on the basis of organic damage; that the eye nerves seemed all right; and that about the only way you could explain her blurred vision was on the basis of hysteria.

Dr. Brown testified that he examined her and had her under observation for some fifteen days following June 3, 1940; that she had a decrease in feeling over the right side of her face and over the entire right side of her body; that x-rays showed no fracture but indicated a shrinkage or atrophy on the surface of the brain; and that this was also indicated by a procedure which he carried out known as encephalogram. He stated that Mrs. Clark gave him her history following the accident on May 2, 1940, and complained of double vision and dizziness when she moved quickly, and that she told him she had had no serious illness and that she had been well up to the time of the accident. Based upon this history and the examination he made he expressed the opinion that there was an atrophy or degeneration of a part of the brain. He stated that this might have come from causes other than an injury, but expressed the opinion that in this case it came from this injury since she had been well before the accident. He further testified that he saw her again in October, 1940, when she came up for a check-up and also saw her the morning of the trial. Although he testified that if there was an atrophy of the brain it would be permanent and no improvement was possible, he testified that he saw a marked improvement when he saw her in October and that when he saw her the morning of the trial she was definitely better than she had been when he first saw her; that she was then not quite as accurate with her right hand as she was with her left; that she could move her arm in all directions; that there was no evidence of actual paralysis; and that she told him she could do her house work but tired easily. He then testified that he thought some improvement could still be expected but that it would be eighteen months or two years from that time before a maximum improvement could be expected; that he was hopeful that her condition would still improve; and that her condition could have come from other causes than the blow she received on this occasion.

The only evidence that any condition from which Mrs. Clark was suffering at the time of the trial would be permanent or with respect to what may be called future damages rests upon the testimony of Dr. Brown. While he testified that there was an atrophy of the brain and that such atrophy is incurable, he impeached his own testimony by testifying that Mrs. Clark had made a marked improvement and that fur-

ther improvement might be expected in the future. The testimony of other witnesses, including Mrs. Clark herself, also shows a very marked improvement in her condition. Moreover, Dr. Brown's opinions were based in part upon Mrs. Clark's history as she gave it to him, including the statement that she was perfectly well before the accident. So far as the record shows, Dr. Brown was not informed that Mrs. Clark was suffering from a goiter and apparently he did not discover that fact or take it into consideration. It is well known that certain types of goiters produce some, if not many, of the symptoms which appeared in Mrs. Clark's condition, and that matter might have an important bearing upon the extent of such of her injuries as arose from this accident. The fact that this was not disclosed to Dr. Brown may have had a considerable effect upon his testimony. Whether or not this is true, it does appear that Mrs. Clark had greatly improved and that further improvement was to be expected, and there is an entire absence of any evidence from which it may be told how much or to what extent detriment may be reasonably "certain to result in the future." The amount of the judgment could only be sustained on the basis that very serious and permanent injuries had been sustained, which in this case means that there was a permanent injury to the brain and nervous system. Since the evidence is not sufficient to show that her condition at the time of the trial will be permanent or to what, if any, extent this condition or part of it may be reasonably certain to continue, the evidence is not sufficient to sustain the amount found in the verdict. It may be further observed that a number of circumstances appear in the record which might well support an inference that the amount of the verdict was the result of passion or prejudice on the part of the jury, and which indicate that an injustice may well have occurred. Under the rather unusual circumstances here appearing, we think the ends of justice require that a new trial be had on the issue as to the amount of the damages, if any, which have been suffered by Mrs. Clark or her husband as a result of the accident in question.

The judgment is reversed and the cause is remanded for a new trial solely upon the issue of the amount of damages, with directions to the trial court to render judgment in favor

of the respondents for the amount of damages so found upon a determination of that issue.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied April 1, 1942, and respondents' petition for a hearing by the Supreme Court was denied April 30, 1942. Carter, J., voted for a hearing.